IN THE MATTER OF STEPHEN FEUERSTEIN, AN
ATTORNEY AT LAW.

Decided May 16, 1989.

## ORDER

The Disciplinary Review Board having filed a report with the Supreme Court recommending that STEPHEN FEUERSTEIN of ENGLISHTOWN, who was admitted to the bar of this State in 1973, be suspended from the practice of law for six months for his violations of *DR* 1–102(A)(5) and (6), *DR* 2–110(A)(1) and (2), *DR* 7–101(A), and *DR* 6–101(A)(1) and (2), and good cause appearing;

It is ORDERED that STEPHEN FEUERSTEIN is suspended from the practice of law, effective June 7, 1989, and it is further

ORDERED that the findings of the Disciplinary Review Board are hereby adopted; and it is further

ORDERED that the Decision and Recommendation of the Disciplinary Review Board, together with this order and the full record of the matter, are to be added as a permanent part of the file of STEPHEN FEUERSTEIN as an attorney-at-law of the State of New Jersey; and it is further

ORDERED that STEPHEN FEUERSTEIN be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that STEPHEN FEUERSTEIN reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics governing suspended attorneys.

## APPENDIX

### Decision and Recommendation of the Disciplinary Review Board

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter is before the Board based upon the Board's decision to treat as a presentment a recommendation by the District IX (Monmouth County) Ethics Committee that respondent be privately reprimanded. The facts are as follows:

Respondent was admitted to the New Jersey bar in 1973. He is also a member of the New York bar. Following his graduation from law school, he received a master's degree in taxation. His law practice is primarily oriented towards tax law and corporate matters. He occasionally handles tax litigation.

Respondent was retained by ISA New Jersey, Inc. ("ISA") to contest an imposition of New Jersey Sales Tax, Corporation

Business Tax, and Emergency Transportation Tax in the approximate amount of $100,000 plus substantial interest and penalties, totalling approximately $200,000. Respondent was recommended to ISA by a relative by marriage, a certified public accountant employed with an accounting firm engaged by ISA.

Respondent initially met with a partner in the accounting firm ("accountant") and with an officer of ISA. He was requested to attend a follow-up meeting at the offices of a New York attorney, who was introduced to him as ISA's corporate counsel. After that second meeting, respondent was retained to handle the tax litigation. From the outset, the ISA officer advised respondent that he had great confidence in the New York attorney's judgment and that respondent should deal primarily with that attorney and with the accountant.

On June 6, 1983, respondent filed a suit against the New Jersey Division of Taxation, contesting the imposition of the above taxes against ISA. Thereafter, he was "completely isolated from [his] client."

On July 15, 1983, the deputy attorney general representing the Division of Taxation served respondent with initial interrogatories. Respondent sent a copy of the interrogatories to the New York counsel. In late July or early August 1983, respondent and the New York counsel met to discuss the interrogatories. Pursuant to respondent's testimony,

> [a]t that time, [the New York counsel] told me how to fill out the interrogatories. It was my judgment that that was totally inadequate, it was not the way I wanted to prosecute this case, it was not the way I wanted to handle the case at all. Basically, my instructions were find an answer, give them no documents, give them no information. [1T23–18 to 24] [1]

Respondent testified further that, although he believed that his client was in possession of documents which were directly

---

[1] IT denotes the transcript of a proceeding before the Tax Court of New Jersey on February 1, 1985, which transcript was admitted into evidence at the ethics hearing as exhibit P–1.

relevant to the answers to the interrogatories, he was denied access to said documents. He objected strenuously to that approach, but was told by the New York counsel, "[y]ou don't need that. Just answer the questions vaguely" (IT24–9 to 10).

Feeling frustrated in his efforts to properly answer the interrogatories, respondent called the ISA officer directly. On the pretext that he would be in the area on another business matter, respondent indicated to the ISA officer that he wished to come by his office in order to obtain certain documents. Respondent testified that

> That was an absolute falsehood. I was not going to be there on any other business. I was going there very specifically to get what I needed for this case. I was somewhat embarrassed, I felt that I had already requested extensions [to answer the interrogatories]. I was not properly being responsive. So I made a little fabrication to say I'm going to be in the area next week, I will see you then. I did not specifically did not [*sic*] call [the New York counsel] to tell him that. I arrived as schedule [*sic*] about 1:00 in the afternoon in a given day and lo and behold, not only was [the New York counsel] there, [his] secretary was with him as well. What do you want; we started. We wound up working until 5:00, maybe 5:30 that afternoon, at which point through negotiations with [the New York counsel], we formulated answers to the interrogatories. We preliminarily agreed on which documents would accompany the interrogatories. I packaged everything up, when his secretary promptly grabs them out of my hand and says I'll type them tomorrow. I said I'd rather take them back to my office and I'll type them. They asked me if I had any of my letterhead with me, which in fact I did, but I refused to give it to them. I told them I did not. Feeling at this point, I didn't feel like fighting with him anymore, I said, Okay, you type them, get them down to my office as soon as they are typed, I will review it and mail it out. The next thing I know, I called two days later, were they typed? Spoke to his secretary who was very rude and nasty to me, indicating they were not quite finished yet. I said please, I've made a commitment, I'd like to get them out. Called a couple of days later, and I was advised, oh, they were mailed several days ago, directly to [my adversary]. [IT24–9 to 25, to IT25–1 to 24.]

The cover letter forwarding the answers to the interrogatories was dated October 26, 1983. Pursuant to respondent's testimony, after learning that the New York counsel had forwarded the answers to interrogatories directly to his adversary and without the benefit of respondent's review, on November 9, 1983, respondent prepared and mailed to the New York counsel a bill for his services. He then called the New York counsel.

At first, respondent was denied access to the attorney by his secretary. After insisting that the New York counsel come to the phone, respondent told him that he was withdrawing as counsel for ISA because his efforts to control the direction of the litigation had been frustrated.

Respondent testified, further, that he called the ISA officer to advise him that he would no longer be handling the matter. The ISA officer attempted to justify the New York counsel's conduct by saying that the latter had intended no harm and that he, the ISA officer, would have the New York counsel call respondent. Respondent replied that he was very upset and insulted, that his professionalism had been compromised and that he no longer wished to continue as counsel for ISA.

Pursuant to respondent's testimony, when the New York attorney did not contact him, respondent called the attorney's office in early December 1983. Respondent was unable to reach him. Although respondent left a message for the attorney to call him back, his call was not returned.

Respondent testified that

[f]rom that point forth, I acted in a manner which I am not exactly proud of. Any further correspondence that I received was unopened, I put it either into the file or on occasion, and I can't remember which ones, I simply directed my secretary to move to—to forward it on to [the New York counsel]. [1T29–3 to 8.]

In the interim, the Tax Court had scheduled a pre-trial conference for January 20, 1984. Although attendance at the pre-trial conference was not required, both parties had to submit a pre-trial memorandum. Counsel for the Director of the Division of Taxation submitted the State's pre-trial memorandum on January 17, 1984. On February 6, 1984, the court wrote to respondent to advise him that, in the event that the court did not receive his pre-trial memorandum by February 17, 1984, the complaint would be dismissed for lack of prosecution. On March 14, 1984, the court dismissed the complaint and entered a judgment against ISA. The Division of Taxation then levied against ISA's accounts payable.

On December 6, 1984, counsel for the Division of Taxation was contacted by an attorney acting in behalf of ISA. The attorney claimed that ISA was unaware of the dismissal of the complaint. After ensuring that ISA post a bond in the amount of the judgment, the attorney filed a motion to vacate the judgment and to reinstate the complaint. On February 1, 1984, the court denied that motion.[2] ISA filed a notice of appeal. The court then requested that the Appellate Division remand the matter temporarily to it for a supplementary hearing. Following the conclusion of the hearing, the court issued a letter opinion dated August 20, 1985, reinstating the complaint.

Respondent testified that he was unaware of the court's letters requesting a pre-trial memorandum and of the court's dismissal of the complaint for lack of prosecution. He reiterated that all correspondence sent to him after early December 1983 would be automatically sent by his secretary to the New York counsel, without a cover letter. He testified, further, that the accountant called him sometime during the 1984 tax season. He did not take that call because he knew that the accountant would attempt to placate him. Because respondent "wanted out," he refused to be placated. At the end of the tax season, the accountant called him once again. This time, respondent accepted his call. When the accountant asked him about the status of the matter, respondent replied that the accountant should have been aware of the notice given to the New York counsel of respondent's intention to discontinue representation in the matter. He complained, also, that his bill for legal services had not been paid. The accountant then promised that a messenger would deliver a check to respondent and would pick up ISA's file on that same day. Respondent did not have the file duplicated before returning it.

Although neither the ISA officer nor the New York attorney

---

[2]On that same day, the court substituted the attorney as counsel for ISA.

testified at the ethics hearing,[3] both testified, at the hearing before the Tax Court, that respondent had not communicated to them his decision to withdraw from the matter. The judge reached that same conclusion.[4]

Following the conclusion of the ethics hearing [5], the committee found that respondent had violated *DR* 2-110(A)(2), by failing to take steps reasonably calculated to avoid prejudice to his clients upon his personal decision to withdraw from employment; *R.* 1:11–2, by failing to withdraw as counsel pursuant to leave of court, on written motion, with notice to all parties; *DR* 7-101(A)(2), by failing to carry out the contract of employment entered into with ISA; and *DR* 6-101(A)(1), by exhibiting a pattern of neglect in the handling of the matter before the Tax Court. The committee recommended that respondent be privately reprimanded.

## CONCLUSION AND RECOMMENDATION

Upon a full review of the record, the Board is satisfied that the conclusions of the district ethics committee that respondent was guilty of unethical conduct are fully supported by clear and convincing evidence. The Board disagrees, however, with the committee's recommendation that respondent be privately reprimanded.

The evidence in this matter consisted of the testimony of respondent's adversary in the tax matter, of respondent's testi-

---

[3]The presenter informed the committee chair that the ISA officer and the New York counsel did not wish to participate in the proceedings. They did not want to "drive here and testify." The ethics complaint was filed by the tax court judge.

[4]The judge's letter opinion dated August 20, 1985 was admitted into evidence at the ethics hearing as exhibit P-2.

[5]Respondent did not file an answer to the ethics complaint. At the ethics hearing of June 24, 1986, he advised the committee chair that he had "verbally denied the allegations (of the complaint)" and, upon inquiry by the chair, agreed to commence the hearing without filing an answer.

mony at the ethics hearing [6] and at the hearing of February 1, 1985, before the Tax Court (Exhibit P–1 in evidence) and, lastly, of the letter opinion of the Tax Court dated August 20, 1985 (Exhibit P–2 in evidence). As noted before, the New York counsel and the ISA officer elected not to testify at the ethics hearing. They did testify, however, at the supplementary hearing before the Tax Court, upon remand.

After hearing the testimony of the three witnesses—respondent, the New York counsel and the ISA officer—the judge found that "the relationship between [respondent] and [the New York counsel] was such as to cause [respondent] to resent the influence which [the New York counsel] had over [ISA]. Further, [respondent]'s decision to stop representing [ISA] in the Tax Court litigation was done without a full understanding by either [the New York counsel] or [the ISA officer] of the extent to which [respondent] was ignoring the litigation." (P–2 in evidence, at 4). The judge concluded that respondent had not advised the Tax Court or his client of "such abdication of responsibility."

The ethics committee reached the same conclusion. It found, however, that respondent's decision to discontinue representation stemmed not from his relationship with the New York attorney but, rather, from his relationship with the client. As the presenter pointed out at the Board hearing, it was the committee's impression that the nature of respondent's relationship with his client was such that it prevented respondent from bringing a motion to be relieved as counsel.

After a complete and independent review of the record, the Board agrees with the conclusion of the Tax Court and of the ethics committee that respondent failed to give due notice of withdrawal both to his client and to the court. As the judge

---

[6]By way of direct testimony, respondent relied on his prior testimony given on February 1, 1985, before the Tax Court at the hearing to vacate the judgment against ISA and to reinstate the complaint.

observed, neither ISA nor the New York attorney had "a full understanding of the extent to which [respondent] was ignoring the litigation." Having heard the testimony of all three witnesses, the judge was in a better position to observe their demeanor and, therefore, carefully assess their credibility. His conclusion deserves great weight.

Once an attorney undertakes to represent a client, he cannot withdraw from employment without properly advising the client of his intention to do so. *Matter of Schwartz,* 99 *N.J.* 510, 519 (1985). This, respondent failed to do. Even if the Board were to lend credibility to respondent's testimony that he communicated his decision to withdraw to the ISA officer and to the New York attorney, it is obvious that the communication was wholly inadequate. Indeed, the client and the New York attorney were laboring under the assumption that respondent continued to handle the litigation. They were unaware that the complaint had been dismissed on March 14, 1984. Clearly, had they been aware that a judgment in excess of $200,000 was about to be entered against ISA, they would have taken immediate action to protect ISA's interests.

Respondent breached his obligation to properly advise his client that he was withdrawing from the matter. Why respondent did not reduce to writing his intention to withdraw is beyond comprehension. Certainly a prudent attorney, who shared concern for his client's interests and for his license to practice law, would have done so.

Compounding respondent's unprofessional conduct are his failure to allow the client reasonable time to retain new counsel, his failure to promptly return to the client all papers and property to which the client was entitled and his failure to comply with the Rules of Court requiring proper withdrawal of representation.

Of equal concern to the Board is respondent's lack of regard for the client's interests, as demonstrated by his adoption of inadequate office procedure to keep the client informed of the

progress of the matter after his "withdrawal." Here, respondent's conduct may only be characterized as reckless. He testified—and conceded his wrongdoing—that he instructed his secretary to forward automatically to the New York attorney any correspondence pertaining to the litigation. Respondent would not review the contents of the correspondence prior to mailing. No cover letter would accompany the correspondence. His reckless indifference to the client's interests is appalling. It is analogous to the "defensive ignorance" approach disapproved by the Court *In Matter of Johnson*, 105 *N.J.* 249 (1987). There, the Court held that the "intentional and purposeful avoidance of knowing what is going on in one's trust account will not be deemed a shield against proof of what would otherwise be a 'knowing misappropriation'." *Matter of Johnson, supra*, 105 *N.J.* at 260. So too, respondent's "willful blindness" towards the developments in the tax litigation cannot operate as an excuse to his gross neglect of his client's interest. The Board finds that respondent's conduct was unprofessional, inexcusable and violative of *DR* 1–102(A)(5) and (6), *DR* 2–110(A)(1) and (2), *DR* 7–101(A)(1) and (2) and *DR* 6–101(A)(1) and (2).

The purpose of discipline, however, is not the punishment of the offender, but "protection of the public against the attorney who cannot or will not measure up to the high standards of responsibility required of every member of the profession." *In re Getchius*, 88 *N.J.* 269, 276 (1982), citing *In re Stout*, 75 *N.J.* 321, 325 (1978). "The severity of the discipline to be imposed must comport with the seriousness of the ethical infraction in light of all the relevant circumstances." *In re Nigohosian*, 88 *N.J.* 308, 315 (1982). Mitigating factors are, therefore, relevant and may be considered. *In re Hughes*, 90 *N.J.* 32, 36 (1982). The presenter informed the Board that the committee had concluded that respondent had not acted with evil intentions and had not intended to harm the client; he had just been emotionally unable to "deal with it" and, perhaps, somewhat

foolish and immature, despite his age. (BT4–13 to 24, BT6–11 to 15) [7]

The Board agrees with the committee's conclusion. Rightfully or not, respondent believed that the New York attorney's method of answering the interrogatories fell short of the standards of integrity expected of a member of the profession. As respondent put it somewhat inelegantly, "I felt that I was being extremely ethical in getting bluntly the hell out of there" (2T44–10 to 12).[8] Because of his limited experience as a litigator, instead of filing a motion to be relieved as counsel, respondent expected his client or the New York attorney to forward him a substitution of attorney and to inform the Tax Court that respondent was no longer ISA's counsel (2T40–9 to 24). He appeared to be unaware that the foregoing procedure was inappropriate (2T40–25, 2T41–1 to 5).

Moreover, the client was not injured by respondent's misconduct. The Tax Court ultimately vacated the judgment against ISA and reinstated the complaint. As noted above, ISA declined to testify against respondent in the ethics proceeding.

Notwithstanding the fact that respondent's improper course of practice in failing to give due notice of withdrawal to the client and to follow the Rules of Court is the result of ignorance, rather than design, this will in no way suffice to absolve him. His irresponsible behavior in connection with the transmittal of important correspondence to the client cannot be tolerated.

In recommending the measure of discipline, the Board must consider respondent's prior disciplinary infractions. In 1983, the same year the within acts of misconduct began, respondent received a public reprimand for exhibiting a pattern of neglect and for failing to carry out contracts of employment in three

---

[7]BT denotes the transcript of the Board hearing on August 17, 1988.

[8]2T denotes the transcript of the ethics hearing on June 24, 1986.

separate matters. *In re Feuerstein,* 93 *N.J.* 441 (1983). In two of those matters, respondent exhibited unprofessional behavior strikingly similar to the one herein. Respondent was retained to represent the purchasers of real estate property. Following the closing of title, respondent unilaterally decided to take no further action in distributing the closing funds because of a dispute concerning his legal fees. He did not furnish his clients with proper notice of withdrawal. A comparison of respondent's conduct in the within matter with his conduct in those prior matters shows also a clear pattern of neglecting clients' interests.

In view of respondent's serious transgressions, current and past, it is the Board's opinion that the interest of the public and the bar will be best served by respondent's suspension from the practice of law for a period of six months. Two members did not participate.

The Board further recommends that respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.